# Brandon *versus* Fritz.

In July 1793, James Sillyman obtained eighteen warrants, of four hundred acres each, previously applied for by him in his own name, and in the names of others, as warrantees. These warrants called for land on the "north side of Mahanoy mountain, supposed to be in Berks county." Surveys were made under these warrants in July 1793, by Henry Vanderslice, deputy surveyor of Berks county, whose location was subsequently found to have been made upon territory in Northumberland county. Vanderslice's surveys were returned 16th July 1793. On the 18th July 1793, a caveat was filed against granting patents thereupon, for the reason that the location interfered with older warrant rights. No citation ever issued upon this caveat. In October 1793, a re-survey of fourteen of the eighteen warrants was made by William Gray, deputy surveyor of Northumberland county, partly upon the same ground previously occupied by Vanderslice, though avoiding the interferences complained of. Gray's surveys were returned 15th March 1794. Five patents were granted upon tracts of the Gray location in 1806; two in 1808; one in 1813, and three in 1865. Upon tracts in the Vanderslice location a patent was granted in 1833, and one in 1870. John Bitler obtained a warrant for one hundred acres of land in 1827, and caused a survey under it to be made by George Reber, D. S., in June 1829. The Bitler survey, as located by Reber upon the ground, interferes with the Gray surveys in the warrantee names of Christian Troxel, Christian Immel, Casper Thiel, and John Shomo.

The Thiel tract was sold to the county for non-payment of taxes in 1834, and sold by the commissioners at public sale in 1843. The Immel and Troxel tracts were sold to the county for non-payment of taxes in 1844, and sold by the commissioners at public sale in 1849. The Bitler tract was sold to the county for non-payment of taxes at the same time with the Immel and Troxel tracts, in 1844, and sold by the commissioners at the same time with the said tracts, by public sale, in 1849. The deed from the commissioners to the purchaser of the Bitler tract was not delivered, nor the purchase-money paid by him, until five years after payment of the purchase-money and delivery of the commissioners' deeds to the purchasers at the same sale of the Immel and the Troxel tracts. In an ejectment by plaintiffs claiming under the Bitler warrant and survey: *Held* (affirming the judgment below), that the eighteen warrants applied for and issued at the same time were intended to form a block of surveys, and that they were so located is clearly shown by the return of Vanderslice July 1793. There was nothing to show that the Vanderslice surveys were ever accepted. A patent was issued by the Commonwealth for the Anna Maria Shomo tract, as located by Vanderslice; this, if done understandingly, would be some evidence of the acceptance of his surveys. But it was clearly shown that the patent was issued by mistake, and contrary to the intention of the party in interest: ·*Held, further*, that the caveat, although never acted upon, afforded sufficient grounds for refusing to accept the Vanderslice returns. Another reason for not accepting them was the fact that the surveys were not within his proper district; though the latter fact would not have invalidated the title if his returns had been accepted and patents issued in pursuance thereof: *Held, further*, that the acceptance of Gray's surveys, as well as his authority to make them, may be inferred from the fact that nearly all the tracts included in his block of surveys have been patented. Granting a patent according to a return of survey, is virtually an acceptance of the return :. *Held, further*, that the plaintiffs' claim was properly restricted to the Christian Troxel tract, as located by Gray, and does not embrace any portion of the Casper Thiel, John Shomo or Christian Immel tract.

March 19th 1880.    Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY and STERRETT, JJ.    GREEN, J., absent.

[Brandon *v.* Fritz.]

Error to the Court of Common Pleas of *Schuylkill county* : Of January Term 1879, No. 237.

Ejectment, brought in 1863, by Nelson Brandon and Henry Snyder against Andrew Fritz, Henry Fermier et al., to recover a tract of land in Union township, Schuylkill county, containing two hundred acres, or thereabouts, bounded by land surveyed to James Smith, Christian Immel, John Klinger, and others. Plea, not guilty. Edward S. Sillyman and James B. Boylan were subsequently added as plaintiffs.

The case came before the Supreme Court on a previous writ of error. See Fritz *v.* Brandon, 28 P. F. Smith 342; s. c., 2 W. N. C. 164.

The case was tried 20th January 1879, before Pershing, P. J. The plaintiffs asserted their title to the land in controversy by an application of John Bitler, dated March 16th 1827, for one hundred acres of land; a warrant dated 21st March 1827, to John Bitler, for one hundred acres of land, "being unimproved, adjoining land surveyed for James Smith on the east, and on the south, west and north vacant," situate in the township of Union, in the county of Schuylkill; and a survey made under this warrant by George Reber, deputy surveyor, dated 22d June 1829, for one hundred and ninety-nine acres sixty-three and a half perches, and allowance for roads; and the return, endorsed "Accepted the 17th October 1829." * * * They then introduced, under objection and exception, parol evidence that John Bitler took up this land in trust for his two daughters, Hannah and Elizabeth, and that they furnished him with the money with which to pay for the survey and the fees of the land office; also that John Bitler executed a deed of conveyance of the same to Hannah and Elizabeth in 1829 or 1830, and that this deed is lost; that Hannah Bitler sold her interest in the John Bitler tract to her sister, Elizabeth Bitler. Also, under objection and exception, parol evidence that Elizabeth Bitler paid the taxes upon this tract from the year 1829 to 1841; and tax receipts of the supervisor of Union township to Hannah and Elizabeth Bitler for thirty-eight cents for road tax in 1834, and for four and a half cents for the year 1840, dated Union township, 1839. * * * They then gave in evidence, under objection and exception, the transcript-book of triennial assessments for Union township, with assessments to Hannah and Elizabeth Bitler, as follows: For the years 1832, 1833 and 1834, "one hundred acres mountain land, fifty acres do.;" for 1835, 1836 and 1837, "sixty acres unseated land;" for 1838 and 1839, "Bitler, Elizabeth, one hundred and three acres land; Bitler, Elizabeth and Hannah, thirty acres land on the Green Mountain," and for 1840, "Bitler, Elizabeth and Hannah, thirty acres land on the Green Mountain;" for 1841, "thirty acres unseated land;" for 1842, "three hundred acres land unseated;" for 1843, "Bitler, Eliza-

[Brandon *v.* Fritz.]

beth, one hundred and three acres of land ; Bitler, Elizabeth and Hannah, three hundred acres unseated land." The plaintiffs alleged that these assessments to Hannah and Elizabeth Bitler refer to the land in controversy ; also that this land was assessed as seated land until the year 1841, after which date it was transferred to the unseated list without notice to Hannah and Elizabeth Bitler, the owners. They introduced under objection and exception, the testimony of a clerk in the office of the county commissioners, to prove that the list of assessments given in evidence was a seated list; it appeared, however, upon cross-examination, that the list was a "mixed list," in which there were assessments both of seated and of unseated land.

They then gave in evidence, under objection and exception, a deed dated 18th December 1858, Elizabeth Bitler to Nelson Brandon, for "all her right, title and interest of, in, and to any and all real estate in the county of Schuylkill to which she may be entitled;" a deed dated 16th April 1860, Elizabeth Bitler to Henry Snyder, for "the undivided one-half part of a certain tract in Union township, Schuylkill county, containing one hundred and ninety-nine acres sixty-three and a half perches, and a release dated 17th April 1860, Nelson Brandon to Henry Snyder, for the same. Then also two deeds, conveying respectively undivided interests in this tract, the one dated 16th January 1872, from Henry Snyder to James B. Boylan, and the other dated 23d December 1872, from Nelson Brandon to Edward S. Sillyman.. They introduced, under objection and exception, the testimony of witnesses to prove that Nelson Brandon had exercised acts of ownership upon the John Bitler tract; that he had built a log house upon it, and had shafted for coal there. They then gave in evidence the receipt of Henry S. Magraw, state treasurer, dated 9th August 1856, to Nelson Brandon, for $73.40, purchase-money and interest due to the Commonwealth upon one hundred and ninety-nine acres sixty-three and a half perches, surveyed in the name of John Bitler, and $10 for patent fees. Also transcript of Union township, from 1854 to 1860, with divers assessments of seated and unseated lands, to John Bitler, deceased, Nelson Brandon and Hannah and Elizabeth Bitler, and, under objection and exception, treasurer's extract book, to show payment of taxes upon the John Bitler tract from 1854 to 1857, inclusive. The plaintiffs then rested.

The defendants gave in evidence an application of James Sillyman, in his own name and in the names of others, dated 1st July 1793, for eighteen tracts of land, of four hundred acres each; eighteen warrants, dated 1st July 1793, each for four hundred acres of land, "on the north side of Mahanoy Mountain, supposed to be in Berks county," in the warrantee names of James Sillyman, Susannah Sillyman, Casper Thiel, Mary Thiel, Henry Thiel,

Christian Immel, George Rose, Catharine Rose, Jacob Kelchner, Maria Kelchner, Ann Maria Shomo, John Shomo, Christian Troxel, John Klinger, John Witman, Mary Witman, Jacob Yeager and William Witman; and surveys made in October 1793, by William Gray, deputy surveyor of Northumberland county, under fourteen of these eighteen warrants; among them those in the warrantee names of Christian Troxel, Christian Immel, Casper Thiel and John Klinger. Upon each survey was the endorsement, " Another return on this same warrant made by Henry Vanderslice, D. S., of Berks county, located in another place." They gave in evidence the old purchase-money voucher and a copy of the purchase-money blotter, " J. Sillyman, &c., July 1, 1793, 18 w'ts of 400 each; 7200 acres, paid in specie 180*l*. Fees 9*l*," and an official connected draft of these fourteen surveys; also a certified copy of the entry of the commission of William Gray, dated 22d April 1785, to be deputy surveyor of all that part of Northumberland county lying east of the river Susquehanna. They proved, by a certified list of returns, that these fourteen surveys were returned to the land office in a block by William Gray, on the 15th March 1794.

They gave in evidence patents to John Meyer, dated 10th December 1806, for each of the tracts respectively, as surveyed by Gray in the warrantee names of James Sillyman, Susannah Sillyman, Henry Thiel, Mary Thiel and George Rose; patents dated 13th January 1808, to John Meyer, for the Catharine Rose and the Jacob Kelchner tracts respectively, as surveyed by Gray; and a patent dated 25th January 1813, to Jacob Trout, for the Casper Thiel tract, also conforming to the survey of William Gray; these, as tending tc show the completion of title to the Gray block of surveys and the acceptance of them by the land office. They then proved assessments for Union township, Schuylkill county, for the years 1841–3, in the names of Christian Troxel, Christian Immel and John Klinger respectively, " four hundred acres unseated land;" a sale by the county treasurer to the county commissioners of the Troxel, Immel and Klinger tracts, for non-payment of taxes, on the 10th June 1844, and gave in evidence a deed for each of them, dated respectively 13th July 1844, from the treasurer to the commissioners. They proved a sale of the said three tracts by the commissioners, on the 16th July 1849, to John W. Roseberry, B. Nehff and H. Krebs, and gave in evidence deeds for the same from the commissioners to Roseberry, Nehff and Krebs, dated respectively 13th August 1849. The plaintiffs objected to the commissioners' deeds that they do not show that the pre-requisites of the Acts of Assembly relative to the sale of unseated lands had been complied with, and also that the deed of the Klinger tract was irrelevant, as not referring to land in dispute. The court admitted the deeds in evidence, and sealed a bill of excep-

tions for the plaintiffs. The defendants further gave in evidence assessments of Union township for 1832 and 1833, in the name of Casper Thiel, "four hundred acres unseated lands," a treasurer's sale of the Thiel tract to the commissioners, for non-payment of taxes, 9th June 1834, and a deed for the same, dated 17th June 1834, from the treasurer to the commissioners; a sale of the Thiel tract on the 13th February 1843, by the commissioners, to Benjamin F. Taylor and John Clayton, and a deed for the same from the commissioners to Taylor and Clayton dated 15th March 1843. The plaintiffs objected to this deed of the commissioners, as to those previously offered. The court admitted it and sealed a bill of exceptions. The defendants then proved that the title of Roseberry, Nehff and Krebs to the Immel and the Troxel tracts and the northern half of the Klinger tract, and the title of Taylor and Clayton to the Thiel tract, have vested, by sundry mesne conveyances of the same, in John H. Brown. They then gave in evidence, under objection and exception, a sale of the Casper Thiel tract by the sheriff of Northumberland county, and deed poll from him dated 22d August 1806, for the same to John Meyer, and showed that the title of John Meyer to the said tract has become vested, by mesne conveyances, through Jacob Trout and others, in John H. Brown; also a lease dated 13th April 1863, John H. Brown to Henry Fermier for the Christian Toxel, Christian Immel and Casper Thiel tracts, and the northern half of the John Klinger tract, under the Gray survey, with renewals of this lease every year, the last renewal from 13th April 1878, to 13th April 1879. They then proved assessments and payments of taxes upon the Casper Thiel, Christian Immel, Christian Troxel, and John Klinger tracts, from the date of the commissioners' sale of the same respectively to the year 1860; also a treasurer's sale for non-payment of taxes for 1860 and 1861, of the Thiel, Immel, Troxel and Klinger tracts to Lewis Reeser, on the 9th June 1862, and gave in evidence deeds for the said four tracts, dated respectively 1st September 1862, from the treasurer to Lewis Reeser; also patents for the Immel, Troxel, and the northern half of the Klinger tracts to Lewis Reeser, dated respectively 28th January 1865. The plaintiffs objected to these patents that they were executed after suit brought. The court admitted them, and sealed a bill of exceptions. The defendants then showed that the title of Lewis Reeser in the Immel, Troxel, and the northern half of the Klinger tracts has vested in John H. Brown; this to show the claim of title in the defendants to the land in controversy, and that the title held by the patentee to these tracts is not an outstanding title. They then proved assessments to Hannah and Elizabeth Bitler in 1841, 1842, and 1843, upon three hundred acres of unseated land in Union Township, alleged by the plaintiffs to refer to the land in controversy, also a sale of the same for non-payment of taxes by

[Brandon v. Fritz.]

the treasurer to the commissioners on the 10th June 1844, and a sale thereof by the commissioners on the 16th July 1849, to C. M. Straub. They proved that Straub did not pay the purchase-money and take his deed until 1854, five years subsequent to the payment of the purchase-money to the county by Roseberry, Nehff, and Krebs for the Christian Troxel tract. They proved that this tract was conveyed by Straub to Elizabeth Bitler, "as tending to show that she claimed the land in controversy under a worthless tax title to Straub, and that it was this title that she subsequently conveyed to Brandon and Snyder in 1858 and 1860." They introduced the testimony of surveyors that the lines of the block of Gray surveys are clearly defined by marks still existing upon the ground, which conform to the calls of the original returns made by Gray, as also to the official location of eleven older surveys adjoining the Gray block, of which the defendants gave in evidence a certified connected draft. The surveyors testified that the John Bitler tract interferes with the Christian Troxel, the Christian Immel, the Casper Thiel, and the John Shomo tracts as located by Gray. It appeared from the testimony of surveyors that the lines had been skilfully shortened in the official return of the John Bitler survey, so as to conform to the quantity of land returned, one hundred and ninety-nine acres sixty-three and a half perches, though that tract, as actually located, embraces two hundred and ninety-nine acres sixty-three and a half perches of land. It also appeared that the territory upon which the surveys of Vanderslice and those of Gray were made was ascertained to have been in Northumberland county by the line run for the purpose of defining the limit of that county in accordance with the Act of 1795, and that this territory became a part of Schuylkill county in 1818. Defendants rested.

In rebuttal, the plaintiffs offered certified copies of eighteen surveys, made in July 1793, by Henry Vanderslice, deputy surveyor of Berks county, and returned by him 16th July 1793, under the same warrants issued upon the application of James Sillyman, dated 1st July 1793, given in evidence by the defendants. To be followed by evidence of the location of these surveys, of their return into the land office, and of their having been filed without objection. To be followed by evidence that the Commonwealth granted patents upon the John Shomo survey, as made by Vanderslice, and rejected the John Shomo, Ann Maria Shomo, and the Casper Thiel surveys, as made by Gray, but subsequently adopted the Gray Casper Thiel, pursuant to a warrant of acceptance issued by the surveyor-general in 1813, before the patent granted thereon to Jacob Trout; that such patent was only in pursuance of such warrant of acceptance and upon payment of the whole purchase-money, as if no original warrant had been issued; that, in 1812, the board of property declared the Gray Casper

Thiel survey void, because made upon a warrant exhausted by reason of the Vanderslice survey of the same; that neither Christian Immel, Christian Troxel, Casper Thiel, John Klinger, John Shomo, or James Sillyman ever asserted any claim of title to the surveys made by Gray in their names respectively as warrantees, or ever paid taxes thereon.    To be followed by evidence from the land office that the board of property never granted any authority either to make, or to accept, the Gray surveys; that the land office does not show a list of accepted surveys applicable to those of Gray; there is no express evidence that it ever adopted the Gray surveys except as to the tracts patented in 1806 and 1808; and that it has treated them, ever since, as void against those of Vanderslice.    To be followed by evidence that the Christian Troxel tract was first assessed in 1818, was sold to the county in 1822 for non-payment of taxes, and that in 1827 or 1828 the county entered upon its records that there was no land to satisfy the assessment of the Christian Troxel tract.

The defendants objected to this offer, which after argument, the court rejected, and sealed a bill of exceptions for the plaintiffs. But subsequently, upon suggestion by the defendants that they were " willing the evidence should go upon record, and the legal effect of the testimony be pronounced by the court at the conclusion of the case," the court allowed the plaintiffs to introduce the evidence as set forth in their offer.    The plaintiffs then introduced the testimony of a clerk in the department of the interior to prove, from the record, that the certificate shown by the defendants is not a certificate of accepted surveys.    It appeared, however, upon cross-examination, that it was not the practice in the land office, before the year 1800 or 1801, to make a note of acceptance upon the survey itself.    It further appeared that these two sets of surveys have been kept together, upon the files, a Gray survey inside a Vanderslice survey, or vice versa.    The plaintiffs followed this testimony by certified copies of the returns made by Vanderslice, in July 1793, upon the eighteen warrants issued on 1st July 1793, to James Sillyman, as contained in their offer, and a certified connected draft of these eighteen tracts of land, "situate on the branches of the Catawissa, on the north side of Mahanoy mountain, county of Berks."    Eleven of these surveys bear the endorsement, " See another return on the same warrant, by William Gray, D. S. of Northumberland county," and similar endorsements are upon the others, except the John Witman, Jacob Yeager, William Witman and Mary Witman, which were located and returned by William Wheeler, D. S., in 1837.    They then gave in evidence a patent, dated 11th December 1833, for the John Shomo tract, as surveyed by Vanderslice, and a patent dated 19th April 1870, for the Ann Maria Shomo tract as surveyed by Vanderslice.    It appeared, however, from the testimony of the patentees of the Ann Maria

[Brandon v. Fritz.]

Shomo tract that they claimed this tract as surveyed by Gray, and lived upon it, and that the patent they obtained from the Commonwealth was not what they wanted, but related to land they never claimed. The plaintiffs then gave in evidence a certified copy of the proceedings of the board of property, dated 13th November 1812, which recites that there was "an irregularity" in the second return (i. e., the Gray return) of the Casper Thiel survey, and directs the secretary of the land office to issue a warrant to the surveyor-general to accept the said survey, made the 23d October 1793, "inasmuch as the said Casper Thiel, and those claiming under him, have held the land from that date to the present time ; and that a patent issue thereon to Jacob Trout, he paying the purchase-money and interest due from the 1st July 1793." They gave also a certified copy of the order from the secretary of the land office to Andrew Porter, surveyor-general, directing him to accept the Gray survey of the Casper Thiel tract, this to show that the board of property treated the Gray survey as void, and for the purpose of rebutting the defendants' general offer of patents as tending to show acceptance of the Gray surveys prior to the date of such patents. They gave further the Gray returns of the surveys made by him upon the warrants to Ann Maria Shomo and John Shomo respectively, with endorsement upon the former : "This return rejected by the board of property as not lying in the same county called for by the warrant;" and upon the latter: "This return rejected by the board of property, there being another return on the same warrant for lands in the county of Berks." They then gave in evidence a warrant to John Bitler, dated 9th April 1811, and a survey upon the same, dated 11th May 1811, to John Bitler, for two hundred and forty-three acres twenty-five perches, and allowance. The survey calls for John Bitler, in the right of George More, of John Klinger, of Mary Thiel, of George Rose, of Catharine Rose, and of Maria Kelcher. Plaintiffs allege that this tract, called, "the long John Bitler tract," interferes with the Gray surveys of the Christian Immel and the Maria Kelchner tracts. Several surveyors testified, however, that the interference alleged arises from a location of this tract with reference to a line called "Meyer's line," or "the line of 1806," which locates the southern boundary of the Gray block of surveys eighty perches north of the lines of older surveys adjoining the Gray block, which are called for in the original returns made by Gray, and in the patents granted to John Meyer. It also appeared that "the line of 1806" is not an official line, and that "the long John Bitler tract" will not interfere, as alleged, if located by its calls in connection with the official lines as run and marked by Gray. The plaintiffs then gave in evidence, under objection, the court reserving the legal effect of the offer for future discussion, assessments of Union township to show that the Christian Immel tract was not assessed from 1811 until 1841 ; also, that

[Brandon *v.* Fritz.]

the Christian Troxel tract was first assessed in 1819, and a sale of the Troxel tract by the treasurer to the commissioners in 1822 for non-payment of taxes, and a sale by them to John Wickersham in 1831, with a deed dated 23d March 1831, from the commissioners to Wickersham for the Christian Troxel tract. The deed was acknowledged, but never delivered; this to show that the assessments of 1841, 1842 and 1843 were void, and the sale thereunder by the treasurer to the commissioners passed no title. They also showed that the Christian Troxel tract was not assessed from 1827 until 1841.

In sur-rebuttal the defendants gave in evidence, under objection and exception, a caveat dated 18th July 1793, filed by John Kunckel and Aaron Bowen, against granting patents for lands situate in Catawissa Valley, Northumberland or Berks county, granted by eighteen warrants dated 1st July 1793, in the warrantee names of James Sillyman, Susannah Sillyman, &c.: "The said Kunckel and Bowen alleging that they have warrants dated 19th May 1792, in the names of Charles Shoemaker, George Raver, &c., for a part of the same land;" offered, under objection and exception, as a caveat filed against issuing patents upon the surveys made by Vanderslice. The defendants also gave in evidence files of newspapers published under date of June 7th and 8th 1849, as also for five consecutive weeks following those dates respectively, to show affirmatively, by the advertisements contained in them, that the commissioners' sale of the Bitler, Immel, Troxel and Klinger tracts, held July 16th 1849, was a public sale, and was duly advertised.

This was followed, upon the part of the plaintiffs, under objection and exception, by a certificate from the office of the surveyor-general, dated 26th November 1873, that there is no record of any citation ever having been issued upon the caveat given in evidence by the defendants, or of any proceedings upon the same by the board of property.

The court below, Pershing, P. J., charged, inter alia: "You have the evidence in regard to the location of these fourteen Gray surveys. Mr. Hawley, a surveyor, says: 'I have not a particle of doubt the Gray surveys were located where claimed. The east line is well marked, extraordinarily so, after this lapse of time.' This is the testimony of Mr. Hawley, a very intelligent witness, produced upon the part of the plaintiffs, and it is the testimony of all the surveyors, with the exception of Stauffer, who did not examine it. There does not appear to be any controversy as to the location of these fourteen Gray surveys. The effect of the confirmatory act of the Commonwealth in granting patents on part of these Gray surveys, extends to the whole block, and is not confined to those only for which the patents were issued: Fritz *v.* Brandon, 28 P. F. Smith 351. One effect of a patent is to merge

[Brandon *v.* Fritz.]

all previous proceedings, and to waive, upon the part of the Commonwealth, whatever informalities may have occurred, so that, upon the granting of it, the title of the patentee as against the Commonwealth becomes complete both in equity and in law. They (the plaintiffs) have offered in evidence the same warrants offered by the defendants, with returns upon them made by Henry Vanderslice, in July 1793, about three months before the surveys were made by Gray, with evidence of the return of these surveys into the land office some eight months prior to the time that Gray made his return. Here arises what is, perhaps, the main controversy in this case. Which of these surveys, those made by Gray or those made by Vanderslice, are the valid surveys? They cover to some extent the same ground. When this question was before the court the last time, we ruled, as a question of law, that the Vanderslice surveys were the valid surveys, for the reasons that they were the first made and returned into the land office; that the rule of law was that, a survey having once been made upon a warrant and returned, the warrant was exhausted, and the second survey upon the same was simply void. We, therefore, instructed the jury squarely, that the Gray surveys were void and that the Vanderslice surveys were valid. The Supreme Court has, just as squarely, decided that we were in error in that instruction, and that the Gray surveys were valid and that the Vanderslice surveys were abandoned. It has been pressed very strongly upon the court what our duty is under the circumstances of this trial. It has been urged that the validity of the Gray and the Vanderslice surveys is a question that should be submitted to the jury upon the facts as they now stand. It is claimed that new facts have been presented, the effect of which should be to change the decision of the Supreme Court, rendered, it is said, under a misapprehension of the facts as they actually existed. It has been repeatedly said in your hearing, that the chief justice not only misapprehended the facts of the case, but stated, in his opinion, matters which the evidence showed were not facts at all, and that, therefore, the decision of the Supreme Court should not bind us in this case. It strikes us that there has been very little new evidence introduced into this trial upon this particular question. Stress has been laid upon the fact that, in the paper-book of the defendants presented to the Supreme Court, their reference to the certificate of the land office as to the Gray surveys, contained in it the words 'accepted surveys.' It has been argued that the Supreme Court was misled by this word accepted. The fact is that both the Gray and the Vanderslice certificates are alike in their language. The plaintiffs, however, directed the attention of the Supreme Court to the fact that the word accepted did not appear in the certificate, and also that the surveys made by Vanderslice were first returned, and that the evidence of their acceptance was

13 NORRIS—7

[Brandon *v.* Fritz.]

precisely that which the defendants offered of the acceptance of the Gray surveys. The patent to Trout, of the Thicl tract, and the proceedings preliminary to granting it, were before the Supreme Court. So also, the fact that two of the Gray surveys were rejected. The John Shomo and Ann Maria Shomo surveys were rejected, and the reasons for their rejection were printed in the paper-book of the defendants. The caveat was also before the Supreme Court, and was printed just as it was read here. It is alleged that it was a mistake to assert that the Vanderslice surveys interfered with any of the lands mentioned by the caveator, and that the Supreme Court was misled by the allegations of this caveat. It does, however, appear in evidence that the Vaderslice surveys interfered with older warrants in the names of Martin Rutherford and others, warrants which were located upon the ground prior to the making of the Vanderslice surveys. We do not think that the Supreme Court were misled by the caveat when they disposed of this case on the writ of error taken to the former judgment of this court. Our error was not the taking of this question from the jury, but it consisted in ruling that the Gray surveys were invalid. This the Supreme Court corrected, by ruling that the Vanderslice, and not the Gray, were the invalid surveys. This is repeated so often, and with such emphasis, throughout the opinion of Chief Justice Agnew, that it is impossible for me to come to the conclusion that I should, in the discharge of my duty, under the evidence as it is now presented, submit to you, as a question of fact, whether the Gray or the Vanderslice surveys were the valid surveys.

"Following the evidence of the defendants, we come to the question of the tax-sales. The requisites of a tax-sale are: That the land must be unseated at the time of the assessment; that a tax appears to have been, and in fact was, assessed by the proper officer; that it was due for one whole year and remained unpaid. Unseated lands assessed are the debtor for the taxes; it is immaterial in what name they are assessed, if it is the same land that is taxed and sold, and was at the time unseated. The sale in the name of a younger warrantee will pass the title, it not being assessed at all in the name of the first warrantee. Upon this subject, as bearing upon some of the questions introduced, it has been held by the Supreme Court that, 'the constructive possession of land, not actually occupied, follows the legal title;' that is, in contemplation of law, every man is in possession of the land he owns, until ousted by an intruder, and abandonment of title is not presumed from non-entry nor from neglect to pay taxes. The law does not limit a man's title to the *possessio pedis.* Inchoate rights may be abandoned, but abandonment is scarcely predicable of perfect titles. And though it is an owner's duty to pay taxes, what if he does not? The law, instead of presuming his title abandoned, seizes it

[Brandon *v.* Fritz.]

and sells it to the highest bidder: Mayor of Philadelphia *v.* Riddle, 1 Casey 263.

"It appears that, in 1841, 1842 and 1843, the Christian Troxel, Christian Immel and John Klinger tracts were assessed with the road, state and county taxes, and that, by the treasurer's sale of the 10th June 1844, these tracts were sold to the county, and deeds delivered in pursuance of the Act of Assembly. It further appears that the commissioners held them for five years, as required by the Act of Assembly, and that, upon the 16th of July 1849, they were sold by the commissioners of the county to John W. Roseberry, Benjamin Nehff and Henry Krebs, who paid their purchase-money and received their deeds upon the 1st of September 1849. A question has been raised as to the validity of this sale. It appears from the evidence, that there was a sale of the Christian Troxel tract, in 1822, to the county, and it is claimed that it could not be assessed for taxes during the time it was the property of the county, only to the extent of the five years limited by the Act of Assembly, during which time the county held the land for redemption. The subsequent assessment, no doubt, was an irregularity, which possibly may be explained as a similar transaction, to some extent, is explained in Goodman *v.* Sanger, 4 Norris 42. Russel *v.* Werntz, 12 Harris 347, is a case where the county taxed land held by itself. It was there held that 'whilst the title was in the county, it could not be prejudiced by the payment of taxes other than those for which it had been sold. If the county taxed lands the title of which was in itself, and parties paid the taxes in ignorance of the fact, they may, perhaps, have an equitable right to reclaim their money; but they cannot invalidate that title in the hands of a bona-fide purchaser from the county.' It is claimed upon the part of the plaintiffs, that they have a right to recover for that portion of the John Bitler survey which interferes with the Casper Thiel, amounting to about thirty-six acres. They claim for that portion of the Bitler, included within the Thiel survey, that the taxes were paid by Hannah and Elizabeth Bitler, in 1831 and 1832, and that, therefore, the sale to the county in 1834, and afterwards by the county to Taylor and Clayton, conveyed no title to that portion of the land on the Thiel survey included within the lines of the Bitler survey. The rule upon this subject appears to be this: 'Proof of the actual payment of the tax avoids the sale:' Hunter *v.* Cochran, 3 Barr 105; Reading *v.* Finney, 23 P. F. Smith 472. They, the plaintiffs, claimed that the sale of the Thiel was invalid, because the Act of Assembly was not complied with. In the case of Lee *v.* Jeddo Coal Co., 3 Norris 74, the Supreme Court held that 'the recitals in the deeds of county commissioners made in pursuance of a sale of land for taxes, prima facie raise a presumption that the commissioners did their duty and made the sale according to law:' McCoy *v.*

[Brandon *v.* Fritz.]

Michew, 7 W. & S. 386. I am inclined to think, from the evidence, it is a fair presumption after the lapse of thirty years or more, that these public officers did their duty. In Lee *v.* Jeddo Coal Co., *supra*, the question as to the conclusiveness of such a presumption is left open. Here, in the absence of evidence to overthrow it, we think the maxim *omnia præsumuntur* has proper application. With regard to the assessments, the question has been raised and argued, that the sale of the Troxel tract as unseated, was void because it was upon the seated list. From the books in evidence and the testimony of Mr. Aregood, it would seem that it was upon what was called 'the mixed list;' a list which contained both seated and unseated lands. It was assessed upon this list as unseated. We say to you, that if this land was entered on what is called the 'mixed list,' if there found assessed as unseated and sold as unseated, the taxes not having been previously paid, it would convey a good title. The court cited in this connection: Laird *v.* Hiester, 12 Harris 452; Thompson *v.* Chase, 2 Grant 367, and Russel *v.* Werntz, 12 Harris 337. That the taxes for 1841, 1842 and 1843, were not paid, is not disputed.

"There is another question of importance in this case which was not raised at the former trial: What have the plaintiffs sued for? What land is embraced in their præcipe and writ? The land described in the præcipe is 'a tract of land situate in Union township, containing two hundred acres or thereabouts, bounded by land surveyed to James Smith, Christian Immel, John Klinger, and others.' In the survey the call is for the Casper Thiel on the north. In the præcipe, reference is made to the deed from Elizabeth Bitler to Snyder, which, it is claimed, is also a part of the description. The adjoiners called for by the præcipe, including the deed, are James Smith, Casper Thiel, Christian Immel, and John Klinger, all older surveys, and all located upon the ground by the testimony of the surveyors. It is claimed, upon the part of the plaintiffs, that they have a right to run beyond the Immel. The land they claim cuts into the Thiel and runs beyond the line of the Immel some on to the Shomo. It is claimed that the survey upon the ground is the true survey without regard to the calls for adjoiners. The official distance for the east and west line between the Thiel and the Troxel is three hundred and twenty perches, and the distance as given on the Bitler is three hundred and ten. Commencing at the Smith and running three hundred and ten perches towards the Immel will not reach the Immel tract. But plaintiffs claim the right to run three hundred and fifty perches, and thus run upon the Immel and the Shomo tracts and include two hundred and ninety-nine acres. It is argued that, these being the lines upon the ground of the John Bitler survey, they must control the calls for the adjoiners, and that the adjoiners cannot control the lines upon the ground.

[Brandon v. Fritz.]

" It is to be remembered that the James Smith is an older survey and its place is well established. The Casper Thiel is an old survey, patented in 1813; while the survey of the Bitler was only made in 1829 and calls for the Thiel. The fact that the Thiel was patented in 1813, was notice to Bitler where the lines of the Thiel survey were located, and, of course, he would have no right to run upon any portion of the Thiel in making his survey. The line of 1806, known as 'the Meyer line,' was introduced in this connection. This line, under the testimony of the surveyors makes great changes in the location of many tracts, and interferes with a large body of surveys. It is only a matter of conjecture for what purpose the line was run, but we think it has nothing to do with, and could not change the location of these surveys as originally returned to the land office. The position taken by the plaintiffs in this case, in reference to 'the Meyer line' of 1806, is like that taken by the plaintiffs in Wagner v. Wagner, 18 P. F. Smith 392. Whatever was the purpose in running this line, it is not claimed it was done by any official authority. We instruct you, therefore, that it can have no weight in deciding the present litigation. But, as bearing directly upon this question of what is included in the plaintiff's description, we have a decision of the Supreme Court where it is distinctly held that: 'It is a principle of construction that, where land is described by courses and distances and also by calls for adjoiners, the latter, where there is a discrepance, invariably govern; and it is applicable to conveyance as well as to official surveys: Cox v. Couch, 8 Barr 154. This has been followed in other cases: Petts v. Gaw, 3 Harris 222. If our construction is correct this controversy is narrowed to the interference of the John Bitler with the Christian Troxel survey. For, following the description contained in the plaintiffs' præcipe and deed, and beginning at the James Smith and running along the Casper Thiel to the Immel and then, by courses and distances, back to the Smith, would not interfere with the Thiel, the Immel or the John Shomo. We are constrained to say to you that, upon the whole evidence in this case, the defendants have a right to a verdict at your hands. In saying this, we negative the points of the plaintiffs."

Exception taken by plaintiffs and bill sealed.

Verdict for the defendants as directed by the court, and judgment thereon. The plaintiffs took this writ, and filed twenty-six assignments of error, among which were the following:

5. The court erred in negativing the plaintiffs' third point, which was: That if the jury believe that the assessment to Hannah and Elizabeth Bitler from 1832 to 1840 inclusive, embraced the John Bitler survey of 1829, and that the said assessment was in the seated list and claimed by Elizabeth Bitler to be so assessed, then the assessment of the same land by any name in the unseated

[Brandon *v.* Fritz.]

list without notice to her, the then owner, was void and the treasurer's sale of 1844, based on such changed assessment, was void as to her and passed no title to the purchasers at the commissioners' sale of 1849.

12. The court erred in negativing the plaintiffs' twelfth point, which was: That the defendants have shown no title to the Casper Thiel at the time they entered upon the land in suit, and when this suit was brought, that the alleged sale and conveyance by the commissioners to Taylor and Clayton, by the deed, dated 15th March 1843, pursuant to sale made 13th February 1843, does not recite any advertisement or notice of the sale, or that the sale was a public one, or made according to law, nor has any evidence been given to show any such advertisement or notice, or that the sale was not a private sale; and that a sale so made would not divest any title of the owners of the John Bitler warrant and survey in suit so far as it interferes with the Casper Thiel.

13. The court erred in negativing the plaintiffs' thirteenth point, which was: That the defendants have given in evidence the assessments, in the names of Hannah and Elizabeth Bitler, and a treasurer's sale, in 1844, by the county treasurer to the county of Schuylkill, and a sale, in 1849, by the county to C. M. Straub; then, if the court hold the sale of 1849 valid against the county, such deed vested in C. M. Straub so much of the Casper Thiel as the defendants admit to have been interfered with by the John Bitler survey in suit, and the title having been vested in the plaintiffs before suit brought they are entitled to recover that part of the land in suit which the defendants admit to be interfered with by the Gray location of the Casper Thiel.

*F. W. Hughes* and *F. W. Bechtel*, for plaintiffs in error.—The Vanderslice surveys were regularly made and returned with the consent of the warrantees, and the title of the warrantees to land in these surveys, not previously appropriated, was complete against everybody but the Commonwealth, who held the legal title as security for patent fees: Drinker *v.* Holliday, 2 Yeates 87; Porter *v.* Ferguson, 3 Id. 60; Hunter *v.* Meason, 4 Id. 107; Adams *v.* Jackson, 4 W. & S. 78; Bunting *v.* Young, 5 Id. 188.

These lands lie in the old purchases. The 15th section of the Act of April 8th 1785, and the 6th section of the Act of April 3d 1792, Purd. Dig. 898, 902, apply only to the new purchases or to purchases from the Indians after 1768; Smith *v.* Wells, 1 Yeates 286; Shields *v.* Buchanan, 2 Id. 219; Funston *v.* McMahon, 2 Id. 245; Harris *v.* Monks, 2 S. & R. 557; McNamara *v.* Shorb, 2 Watts 288, 292; Prout *v.* Bard, 10 Id. 379; Goddard *v.* Gloninger, 5 Id. 222.

The Act of 1795, which provided for a commission to mark the line between Northumberland county and Berks county, rendered

[Brandon v. Fritz.]

valid all surveys previously made by any deputy surveyor. That Vanderslice was out of his district, does not invalidate the surveys made by him in 1793.

The caveat filed by Kunckel and Bowen was not directed against the surveys made by Vanderslice, but against the granting of patents to Sillyman and the other warrantees, for the lands granted them by warrants dated 1st July 1793. The reason assigned by the caveators is, that they had other warrants for a part of the same land; they do not allude to any surveys, whether of Vanderslice or of any other person. No subsequent survey upon the land called for in the Sillyman warrants could remove this objection; hence Gray's surveys were nugatory. The opinion of the learned chief justice, reversing the judgment of the lower court, at the former hearing of this case, is predicated upon an erroneous assumption of facts: Fritz v. Brandon, 28 P. F. Smith 350.

A second survey, made without a previous warrant of re-survey from the surveyor-general or the board of property is void: Drinker v. Holliday, supra; Porter v. Ferguson, supra; Deal v. McCormick, 3 S. & R. 343; Oyster v. Bellas, 2 Watts 397; Cassidy v. Conway, 1 Casey 240; Bellas v. Cleaver, 4 Wright 260; Hughes v. Stevens, 7 Id. 202; Improvement Co. v. Munson, 14 Wall 442.

At the end of twenty-one years, after a survey has been made and returned into the land office, a presumption of law arises that it was regularly made on the ground; but it is denied that this presumption extends to the authority to make it.

The Gray surveys, being unofficial, were not notice to subsequent appropriators: Barton v. Smith, 1 Rawle 403; Manhattan Coal Co. v. Green, 23 P. F. Smith 320. Where a survey is removed, or shifted to lands not described in the warrant, title begins from the time the survey is returned and accepted: Lauman v. Thomas, 4 Binn. 58; Moore v. Shaver, 6 S. & R. 133. The Immel and Troxel tracts were sold by the commissioners for non-payment of taxes, under different assessments, on the same day. These sales were to effect a payment of the taxes by each claimant under his own assessment, and left each claimant's title just where it was before: Hunter v. Albright, 5 W. & S. 423; Diamond Coal Co. v. Fisher, 7 Harris 267; Fritz v. Brandon, 28 P. F. Smith 356. Though a patent conveys the legal estate, as against the Commonwealth, it will not prevail over a prior estate by warrant and survey: Maclay v. Work, 5 Binn. 154; Gonzalus v. Hoover, 6 S. & R. 118; Woods v. Wilson, 1 Wright 379. A patent inures to the benefit of the owner of the title, though issued to another. Urket v. Coryell, 5 W. & S. 60. A patent obtained through ignorance of the land office, does not legalize an unauthorized survey: Burd v. Seabold, 6 S. & R. 137. Land that has

been assessed upon the seated list, upon which taxes have been paid as upon seated land, cannot be transferred to the unseated list, assessed and sold as unseated land, without notice to the owner: Larimer *v.* McCall, 4 W. & S. 133; Milliken *v.* Benedict, 8 Barr 169; Com. Bank *v.* Woodside, 2 Harris 404; Stewart *v.* Trevor, 6 P. F. Smith 374; Bechdle *v.* Lingle, 16 Id. 38.

. *James Ryon* and *George R. Kaercher* (with them *S. H. Kaercher, John W. Ryon* and *C. Tower, Jr.*), for the defendants in error.— Vanderslice located the warrants involved in this controversy wholly out of his district. His surveys were the acts of a private person, and without legal authority: Lesse of Hubley *v.* Chew, 2 Sm. Laws 257. This principle is not shaken by the ruling in Shields *v.* Buchanan, *supra*, and Funston *v.* McMahon, *supra;* for the surveys in those cases were made and returned by persons who never had commissions as deputy surveyors. Every survey made by a deputy surveyor out of his proper district is void: Act 1792, sect. 6, 3 Sm. Laws 70. A deputy surveyor, without a special authority, cannot go beyond the known lines of his district to make a survey: Harris *v.* Monks, 2 S. & R. 557.

The Vanderslice surveys were returned as located in Berks county; the acceptance of them cannot be construed as a ratification by the surveyor-general of an irregular act; for the limits of the county were not defined until two years later.

It is not denied that, after a survey has been made and returned, no new survey can be made on the same warrant without a new authority; but this rule pre-supposes the first survey to have been made by the regular deputy within his district.

Gray's surveys were returned upon lands in his own district, and accepted immediately by the surveyor-general; they were surveyed and returned as a block, the property of James Sillyman; five of them were patented in 1806, two in 1808 and one in 1813; the warrants surveyed by Gray at the same time upon a portion of Vanderslice's location abandoned by the resurvey were accepted, and some of them patented in 1794; the title under the Gray location was sold to actual settlers, who have occupied and improved the land; these lands have been assessed and have paid taxes since the territory became a part of Schuylkill county; no one ever claimed under the Vanderslice surveys, and they were never taxed; Gray's returns were accepted more than thirty-five years before the John Bitler warrant was located. These facts justify the presumption that the surveyor-general gave a special authority for a resurvey: Goddard *v.* Gloninger, 5 Watts 221; Creek *v.* Moon, 7 S. & R. 330; Bellas *v.* Levan, 4 Watts 294; Caul *v.* Spring, 2 Id. 390; Collins *v.* Barclay, 7 Barr 67; Nieman *v.* Ward, 1 W. & S. 68; Lambourn *v.* Hartswick, 13 S. & R. 113; Brock *v.* Savage, 10 Wright 83. If a resurvey abandons the lines

[Brandon *v.* Fritz.]

of the original survey, and the parties subsequently claim by the resurvey, the land thrown out by it is abandoned, and left open to reappropriation: Sabins *v.* McGhee, 12 Casey 453. So, where a warrantee has two surveys of different tracts made on the same warrant, and accepts a patent for one of them, the other is subject to appropriation by a settler: Coxe *v.* Woolbach, 2 Casey 122.

Ever since the case of Drinker *v.* Holliday, *supra*, the rule has been, in Pennsylvania, that where a survey has been made, returned, and accepted, a new one cannot be made without the assent of those representing the Commonwealth, and not even then so as to affect intervening rights: Cassidy *v.* Conway, 1 Casey 240.

The courts of this state have uniformly refused to go back more than twenty-one years to settle difficulties about the issuing of warrants or patents, or the making or returning of surveys, or payment of the purchase-money to the Commonwealth: Strimpfler *v.* Roberts, 6 Harris 283.

The plaintiffs do not claim title under the Vanderslice surveys, or in any manner connect themselves with that title. It is worthy of consideration whether they were in a position to make use of those surveys to defeat the defendants' possession and claim under the resurveys: Belliot *v.* Bauman, 5 W. & S. 150; Hull *v.* Campbell, 6 P. F. Smith 154; Glass *v.* Gilbert, 8 Id. 266.

The authority of Gray was just as great to make the survey of these fourteen tracts as it was to make a survey of a single one of them. The Commonwealth has granted patents upon seven of the tracts; if Gray's act was valid as to these seven, it was so as to the whole block. After a lapse of eighty years, and after the settlement of this whole country, the presumption is one of law that these surveys were made under competent authority: Caul *v.* Spring, 2 Watts 394; Strimpfler *v.* Roberts, 6 Harris 299; Ormsby *v.* Ihmsen, 10 Casey 462; McBarron *v.* Gilbert, 6 Wright 279; Stephens *v.* Cowan, 6 Watts 515; Malone *v.* Sallada, 12 Wright 425; Darrah *v.* Bryant, 6 P. F. Smith 73.

In reply to the plaintiffs' 5th assignment of error. The assessments to Hannah and Elizabeth Bitler of thirty acres as unseated land, on the mixed list, for 1838, 1839 and 1840, and of sixty acres so assessed for 1835, 1836 and 1837 were frauds practised upon the county by the owner of the land, if they referred to the John Bitler tract of three hundred acres, and no correction and placing of the tract upon the proper list by the proper officer, at the lawful time appointed for making the triennial assessments would prevent a valid sale of the land for non-payment of taxes, either upon that assessment or upon the assessments in the names of Christian Troxel and Christian Immel: Clarke *v.* Dougan, 2 Jones 87.

[Brandon *v.* Fritz.]

As to the validity of the tax sales of the Immel and Troxel tracts, see Laird *v.* Hiester, 12 Harris 453 ; Arthurs *v.* Smathers, 2 Wright 40 ; Bechdle *v.* Lingle, 16 P. F. Smith 38 ; Stewart *v.* Trevor, 6 Id. 374 ; Thompson *v.* Chase, 2 Grant 367 ; Russel *v.* Werntz, 12 Harris 337.

In reply to the plaintiffs' 12th assignment of error. A deed from the county commissioners, in fee simple, duly acknowledged, conveys effectually the county's title: Act of 29th March 1824, Purd. Dig., p. 1452, sect. 51.

The plaintiffs cannot object to the sale of the Casper Thiel tract that the commissioners did not recite, in their deed, advertisement and notice of sale, &c. ; for, excepting the single requirement that the sale shall be public—and the defendants have shown affirmatively in their evidence that the sale of the Thiel tract to Taylor and Clayton was a public sale—the provisions of the Act of 1824, in regard to the sale of lands by the commissioners after title has become absolute in the county, are simply directory : Huston *v.* Foster, 1 Watts 477 ; Kirkpatrick *v.* Mathiot, 4 W. & S. 251 ; Jenks *v.* Wright, 11 P. F. Smith 410 ; Hess *v.* Herrington, 23 Id. 438 ; Lee *v.* Jeddo Coal Co., 3 Norris 74 ; McCoy *v.* Michew, 7 W. & S. 386.

In reply to the plaintiffs' thirteenth assignment of error.—All taxes due on the Thiel tract prior to 1843 were discharged by the sale to Taylor and Clayton ; the sale in 1844 of so much of the Thiel tract as may have been interferred with by the Hannah and Elizabeth Bitler 300-acre tract was void ; no title passed to the county, and it had no title to sell to Straub in 1849. The absence of the requisites of a valid sale renders the sale void. If the tax be not due and unpaid one whole year, there is no authority to sell : Laird *v.* Hiester, 12 Harris 453 ; McReynolds *v.* Longenberger, 25 P. F. Smith 13 ; Rogers *v.* Johnson, 17 Id. 43 ; Breisch *v.* Coxe, 31 Id. 336. The county owned the Thiel tract in 1843, hence it could levy no tax upon it for that year. There is no authority to levy tax for a portion of a year, nor can a tax be apportioned by the county so as to assess part of it to its vendee and assume the other part itself.

The land described in the plaintiffs' præcipe and writ would not cover any part of the Thiel, Shomo or Immel tracts, but it would lie entirely upon the Christian Troxel tract. The defendants never claimed the John Shomo tract. Their plea of not guilty was only prima facie evidence of their being in possession of the land described in the writ, which did not include any part of the John Shomo tract, and it was competent for the defendants to show that they were not in possession of that tract.

The contest before the court and the jury was as to whether the plaintiffs or the defendants have a better title to that portion of the Christian Troxel tract with which the John Bitler survey interferes.

[Brandon v. Fritz.]

The doctrine of abandonment of the valid title, by warrants and surveys, to the Immel and Troxel tracts under the Gray location, in favor of the void survey to John Bitler, has no foundation in the law of Pennsylvania. If an abandonment is to be presumed, it is one in favor of the owners of the tax title to the Immel and the Troxel tracts, and not in favor of the void survey to John Bitler: Bunting v. Young, 5 W. & S. 197; Foust v. Ross, 1 Id. 506.

[We are indebted for the report of this case to the editor of Weekly Notes of Cases.—Rep.]

Mr. Justice STERRETT delivered the opinion of the court, Oct. 4th 1880.

The controlling questions presented by this record are substantially the same that were fully considered and determined when the case was here on the former writ of error, and if we adhere to the principles upon which that decision is based, the present judgment should be affirmed, and but little, if anything, need be added to what is said in the elaborate opinion of the court by Chief Justice AGNEW, reported in 28 P. F. Smith 350, in which all the authorities are collected, and the questions involved fully discussed. Even if there should be doubt as to the soundness of some of the conclusions there reached, the doctrine of *stare decisis* forbids that the former decision, by which the court was guided in the last trial, should be virtually overruled.

The claim of the plaintiffs was founded on the John Bitler warrant of 1827, and survey made, returned and accepted in 1829, and it may be assumed, for the present, that the verdict should have been in favor of the plaintiffs, unless the defendants succeeded in showing an older and better title, which it is contended they did. They claimed under the warrants of July 1st 1793, and surveys thereunder made and returned in 1794 by William Gray, deputy surveyor of Northumberland county, in whose district the lands were situated; and then connected themselves with these warrants and surveys by tax titles.

The main question on the last as well as the former trial, was whether the Gray surveys were valid appropriations of the land in dispute. The plaintiffs contended that they were not, for the reason that surveys under the same warrants were previously made and returned by Henry Vanderslice, deputy surveyor of Berks county, within a few weeks after the warrants were issued; that the Gray surveys were made under exhausted warrants, without an order of re-survey and therefore void, and that they were never accepted. It cannot be doubted that the eighteen warrants which were applied for and issued at the same time, and on which the purchase-money appears by the entry to have been paid in a gross sum, were intended to form a block of surveys; and that they

were so located is clearly shown by the return of Vanderslice, made July 16th 1793. There was nothing to show that the Vanderslice surveys were ever accepted. It is true, that about nine years ago a patent was issued by the Commonwealth for the Ann Maria Shomo tract, as located by Vanderslice. This, if done understandingly, would be some evidence of the acceptance of his surveys, but it was clearly shown that the patent was issued by mistake and contrary to the purpose and intention of the party in interest. The tract thus patented by mistake was covered by surveys of the Gray location, under which it was patented more than three-quarters of a century ago, and occupied for about the same length of time. It may therefore be said, with substantial accuracy, that there was no evidence of acceptance of the Vanderslice surveys; on the contrary, satisfactory reasons for their nonacceptance were disclosed.

On July 18th 1793, two days after the Vanderslice returns were made to the land office, a caveat was filed on behalf of persons claiming under prior warrants with which there was an alleged interference. While it does not appear that the caveat was ever acted on or any citation issued, it still afforded sufficient grounds for refusing to accept the Vanderslice returns; and to this, perhaps, may be added as a further reason, the fact that the surveys were not within his proper district. This latter fact, however, would not have invalidated the title if his returns had been accepted and patents issued in pursuance thereof. Shortly after the caveat was filed, the same warrants found their way into the hands of William Gray, deputy surveyor of Northumberland county, who, in October 1793, located fourteen of them in a single block, partly on the same ground covered by the former survey, but so as to avoid any interference with older rights. These surveys were returned in March of the following year, and while the records of the land office fail to furnish any direct evidence of Gray's authority to make the re-survey or of the acceptance of his returns, they do show that nearly all the tracts included in his block of surveys were from time to time patented; from which latter fact the acceptance of his surveys as well as his authority to make them may be inferred. Granting a patent according to a return of survey is virtually an acceptance of the return. Patents were granted to John Meyer in 1806 for the James Sillyman, Susanna Sillyman, Henry Thiel, Mary Thiel and George Rose tracts, reciting deeds poll from the warrantees, dated July 14th 1793; in 1808 patents were issued to the same person for the Catherine Rose and Jacob Kelchner tracts, reciting deeds poll from the warrantees dated July 10th 1793, and in later years patents were issued for other tracts in the same block. When these patents were issued, the fair presumption is that the proper officers of the land department had before them satisfactory evidence of the regu-

[Brandon v. Fritz.]

larity of the Gray surveys.    This presumption is strengthened by the fact that the Vanderslice surveys were never recognised either by the Commonwealth or the warrantees as the foundation of title; and after so great a lapse of time, under the leading and undisputed facts of the case, the presumption should be regarded as conclusive that the Vanderslice surveys were not accepted, and that the re-surveys made by Gray were authorized and his returns accepted.    The reasons and authorities in support of this presumption are so fully given in the opinion referred to, that nothing more is now required.    The learned judge of the Common Pleas adhered strictly to the principles of law therein recognised, and as we think, correctly held that there was not sufficient additional or different testimony introduced at the last trial to justify any other course.    As remarked in the outset, the controlling questions are the same as in the former trial, and the facts upon which they must be determined are substantially the same.

Those portions of the charge which relate to the tax titles given in evidence and relied on by the respective parties are unobjectionable and require no further notice.

Under the construction correctly put upon the præcipe by the court, the plaintiffs' claim was properly restricted to the northerly portion of the Christian Troxel tract, as located by the Gray survey, and did not embrace any portion of the Casper Thiel, John Shomo or Christian Immel tracts.    The charge of the learned judge on this point is quite clear and conclusive.

We discover nothing in any of the assignments of error to justify a reversal of the judgment.

Judgment affirmed.